BOARD OF COMMISSIONERS OF HAMILTON COUNTY, OHIO, Appellant,

v.

CITY OF CINCINNATI, Defendant/Third–Party Appellee;
The State of Ohio, Third–Party Appellant.

[Cite as *Hamilton Cty. Bd. of Commrs. v. Cincinnati,*
154 Ohio App.3d 504, 2003-Ohio-5089.]

Court of Appeals of Ohio,
First District, Hamilton County.

Nos. C–020747 and C–020761.

Decided Sept. 26, 2003.

Dinsmore & Shohl, LLP, Mark A. Vander Laan and Timothy S. Mangan, for appellant.

Jim Petro, Attorney General, and Diane M. Weaver, Assistant Attorney General, for third-party appellant state of Ohio.

Julia L. McNeil, City Solicitor, and Richard Ganulin, Assistant City Solicitor, for third-party appellee city of Cincinnati.

Furnier & Thomas, LLP, and Rasheed A. Simmons, for amicus curiae Bond Hill Community Council and Bond Hill Community Urban Redevelopment Corporation.

———————

Per Curiam.

{¶ 1} This is the second appeal in a dispute over the zoning of property owned by plaintiff-appellant, the Board of Commissioners of Hamilton County, located inside the boundaries of defendant/third-party plaintiff-appellee, the city of Cincinnati. Upon remand from this court's decision in the first appeal, rather than resolve the equities of the zoning issue, the trial court entered summary judgment for the city and invalidated the 1997 transfer of the property from the third-party defendant-appellant, the state of Ohio, to the county.

{¶ 2} In these consolidated appeals, the county, in the appeal numbered C–020747, and the state, in the appeal numbered C–020761, both challenge the trial court's October 25, 2002 entry of summary judgment for the city in which it ordered that the 1997 transfer of the property be nullified, that the county relinquish the property, and that the state tender an offer to the city to purchase the property. Because the city's right of first refusal to purchase the property, created by a legislative enactment, was not triggered by the 1997 transfer, and because the General Assembly may convey state-owned property pursuant to a legislative enactment, the judgment of the trial court must be reversed.

## FACTS

{¶ 3} The dispute centers upon what is known as the Millcreek property, a 25–acre site containing nine buildings located on the corner of Paddock Road and East 66th Street in the city of Cincinnati. In 1981, the General Assembly conveyed certain properties, not including the Millcreek property, to the city by enacting Am.S.B. No. 143. Section 5 of Am.S.B. No. 143, and the accompanying Governor's Deed dated January 12, 1982, stated that if the Ohio Department of Mental Health determined that the Millcreek property was surplus real estate, and if the state offered the real estate for sale at its appraised market value, then the city had a right of first refusal for the purchase of the property at its appraised value.

{¶ 4} From 1978 until July 1995, the Millcreek property was used by the Ohio Department of Mental Health, ultimately for the operation of the Millcreek Psychiatric Center for Children. The county proposed to use the property for an emergency management agency, a soil and water conservation district, an Ohio State University Extension, and a juvenile detention facility.

{¶ 5} Pursuant to other legislation, Sub.S.B. No. 113, effective October 21, 1997, the state of Ohio conveyed the Millcreek property to the county for $1.5 million, the amount of the state's bond indebtedness. The appraised value of the property was approximately $2.4 million. The city had been aware of the conveyance and had expressed an interest in purchasing the property.

{¶ 6} In 1998, after its petition to the Cincinnati City Council to amend the property's zoning to permit a juvenile facility was denied, the county commenced an action for declaratory judgment challenging the city's zoning of the property. The county also served the state of Ohio, which did not participate in the action. The city filed a motion to dismiss the county's complaint, pursuant to Civ.R. 12(B)(6), alleging the primacy of its home-rule powers over zoning. The trial court granted the motion.

{¶ 7} In the first appeal, we reversed the dismissal of the county's complaint and remanded the case to the trial court, instructing that it "must proceed" to a hearing on the appropriateness of the zoning in accordance with *Brownfield v. State* (1980), 63 Ohio St.2d 282, 285, 17 O.O.3d 181, 407 N.E.2d 1365. The city's appeal to the Ohio Supreme Court was not allowed. *Hamilton Cty. Bd. of Commrs. v. Cincinnati* (Nov. 19, 1999), 1st Dist. No. C–990431, 1999 WL 1043737, appeal not allowed (2000), 88 Ohio St.3d 1478, 727 N.E.2d 130.

{¶ 8} Six months after this court's order of remand was journalized, the city answered the county's complaint, filed counterclaims against the county, and filed a third-party complaint against the state. Its counterclaims and third-party complaint also sought a declaratory judgment, raising new assertions that, inter alia, the state's conveyance of the Millcreek property to the county in 1997 was unlawful and that the city was entitled to specific performance requiring the county to relinquish the property and the state to tender the property to the city. The city then began discovery.

{¶ 9} One year later, in June 2001, the state and the county moved for judgment on the pleadings, pursuant to Civ.R. 12(C). The city then filed a motion for summary judgment, pursuant to Civ.R. 56. Fourteen months later, the trial court issued a decision granting, in part, the city's motion for summary judgment and denying the county's and the state's motions for judgment on the pleadings. The trial court ordered that the 1997 transfer of the property be nullified, that the county relinquish the property, and that the state tender an offer to the city to purchase the property. The trial court denied the city's claim for the costs of the litigation. While admonishing the parties to seek a settlement of the issues before appeal, the trial court entered judgment. The county and the state appealed. During the 37 months between this court's decision in the first appeal and the granting of the city's summary-judgment motion on remand, the trial court did not hold the mandated *Brownfield* hearing.

## STANDARDS OF REVIEW

{¶ 10} The function of summary judgment is to determine from the evidentiary materials whether triable factual issues exist, regardless of whether the facts are complex. A court is not precluded from granting summary judgment merely because of the multiplicity of claims or because of the volume of the factual record. See *Gross v. Western–Southern Life Ins. Co.* (1993), 85 Ohio App.3d 662, 666–667, 621 N.E.2d 412. A motion for summary judgment shall be granted if the trial court, upon viewing the inferences to be drawn from the underlying facts set forth in the pleadings, depositions, answers to interrogatories, written admissions, and affidavits in a light most favorable to the party opposing the motion, determines (1) that no genuine issue of material fact remains to be litigated; (2) that the moving party is entitled to judgment as a matter of law; and (3) that the evidence demonstrates that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party opposing the motion. See Civ.R. 56(C); see, also, *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264. Because summary judgment presents only questions of law, an appellate court reviews the record de novo. See *Polen v. Baker* (2001), 92 Ohio St.3d 563, 564–565, 752 N.E.2d 258.

## ASSIGNMENTS OF ERROR

{¶ 11} The county raises two assignments of error in its appeal, and the state raises three assignments of error.[1] In the various assignments of error, the two parties contend that the trial court erred in entering summary judgment for the city on four principal grounds: first, that the 1997 transfer of the Millcreek property to the county for the amount of the bond indebtedness did not trigger the right of first refusal; second, that when the General Assembly conveys state-owned property pursuant to legislation, it need not comply with the requirements of R.C. 5119.39; third, that the city's right of first refusal violated the rule against perpetuities; and, fourth, that the city was not entitled to have the county relinquish the Millcreek property and then to have the state tender it for sale to the city.

### The Right of First Refusal

{¶ 12} A right of first refusal is a preemptive right to purchase real property. It simply requires an owner, willing to sell, to offer it to the holder of

---

1. The county and the state have not assigned as error the trial court's denial of their motions for judgment on the pleadings, made pursuant to Civ.R. 12(C). Errors not treated in a brief will be regarded as having been abandoned. See App.R. 12(A)(1)(b); see, also, *Morton Internatl., Inc. v. Continental Ins. Co.* (1995), 104 Ohio App.3d 315, 662 N.E.2d 29, fn. 3. But our resolution of the five assignments of error raised by the county and the state, absent discretionary review by the Ohio Supreme Court, will become the law of the case and will be binding on the trial court in its further proceedings. See id. at 320, 662 N.E.2d 29.

the right. See *Stratman v. Sheetz* (1989), 60 Ohio App.3d 71, 73, 573 N.E.2d 776. A right of first refusal differs from an option since an option gives the grantee the power to compel the owner to sell the property. See id. The right-of-first-refusal provision of Section 5 of Am.S.B. No. 143, however, was contingent upon more than the state's desire to part with the Millcreek property. It required the owner, the state, to offer the property first to the holder of the right, the city, if the state decided to sell and if the conditions precedent were fulfilled. Section 5 provided that *if* the Ohio Department of Mental Health determined that the Millcreek property was surplus real estate, and *if* the state offered the real estate for sale at its appraised market value, then the city's right of first refusal arose.

{¶ 13} The construction of instruments of conveyance is a question of law and thus may be resolved by summary judgment. See *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146, paragraph one of the syllabus; see, also, *Burk v. State* (1992), 79 Ohio App.3d 573, 607 N.E.2d 911. Here, there is no evidence that the Department of Mental Health designated the property as surplus real estate. That contingency failed. Moreover, the state transferred the property through a legislative enactment, Sub.S.B. No. 113, for the amount of the state's bond indebtedness on the property—$1.5 million. None of the differing values for the property found in the evidence in support of the city's summary-judgment motion represented a valid appraisal of market value for sale. The second contingency failed as well.

{¶ 14} Because neither contingency of Section 5 occurred, the state, whatever its practical obligations to the city, did not have a legal obligation to offer to sell the Millcreek property to the city before transferring it to any other entity.

## Legislative Transfer of the Property

{¶ 15} The county and the state next contend that the trial court erred in concluding that the 1997 transfer was void because it was not made in accordance with R.C. 5119.39. The trial court, agreeing with the city, concluded that the General Assembly had acted "in violation" of its contractual and statutory powers by transferring the Millcreek property legislatively to the county rather than pursuant to R.C. 5119.39.

{¶ 16} R.C. 5119.39(A) delegates to the Director of the Department of Mental Health authority to "enter into agreements with any person, political subdivision, or state agency for the sale or lease of land or facilities under the jurisdiction of the director." It then prescribes the detailed procedure that the director must follow to dispose of state property. If the contingencies for the city's right to first refusal had been met, the director of the department would have had to comply with R.C. 5119.39 to complete the sale of the Millcreek property.

{¶ 17} But R.C. 5119.39 does not describe the only means by which the state may dispose of its real property. Separate from the statute, the General Assembly has the power to transfer real property through a legislative enactment. See Section 13, Article VIII, Ohio Constitution. In R.C. 5119.39, the General Assembly delegated its power to sell property. What the General Assembly delegated, it could retrieve. Indeed, the city's contingent right of first refusal for the Millcreek property and its interests in other parcels of real estate were created in an identical fashion by means of the 1981 legislative enactment of Am.S.B. No. 143.

{¶ 18} As there is no legal authority that required the Millcreek property to be sold only by means of the procedures in R.C. 5119.39, and as the General Assembly had the authority to transfer the property by enactment, the trial court erred in nullifying the 1997 transfer on the basis of noncompliance with R.C. 5119.39.

## The Rule Against Perpetuities

{¶ 19} The county next contends that the right of first refusal, contained in Section 5 of Am.S.B. No. 143, and in the accompanying Governor's Deed, violated Ohio's statute against perpetuities, R.C. 2131.08, and was void. The statute codifies the common-law rule against perpetuities, a device to prevent restraints on the alienability of property. See *Quarto Mining Co. v. Litman* (1975), 42 Ohio St.2d 73, 76, 71 O.O.2d 58, 326 N.E.2d 676. A right of first refusal in the sale of property is subject to the statute against perpetuities. See *Schafer v. Deszcz* (1997), 120 Ohio App.3d 410, 414, 698 N.E.2d 60.

{¶ 20} R.C. 2131.08(A) states that "no interest in real or personal property shall be good unless it must vest, if at all, not later than twenty-one years after a life or lives in being at the creation of the interest." The city's right of first refusal was of unlimited duration, and as the city could have conceivably elected to exercise the right in the distant future, the city's right might well have violated the common-law rule embodied in section (A).

{¶ 21} But R.C. 2131.08(C), effective since 1967, provides that "[i]n determining whether an interest would violate the rule * * * the period of perpetuities shall be measured by actual rather than possible events." As Professor W. Barton Leach, a proponent of perpetuities reform, has noted, this wait-and-see policy "permit[s] the court, in passing on the validity of the interest, to take account of facts which have occurred after creation of the interest." Leach, Perpetuities: The Nutshell Revisited (1965), 78 Harv.L.Rev. 973, 988. In determining the application of the rule, a court should look at these actual events and then determine whether the interest in fact violates the rule. See *Loeffler v.*

*Crosser* (June 11, 1999), 6th Dist. No. OT–98–034, 1999 WL 375525; see, also, *Stratman v. Sheetz* (1989), 60 Ohio App.3d 71, 573 N.E.2d 776, fn. 1.

{¶ 22} As the city sought to exercise its right of first refusal no later than 1997, within the life of one in being at the time of its creation in 1981, the interest created by Section 5 of Am.S.B. No. 143, if enforceable, would not have failed due to the rule against perpetuities.

{¶ 23} Based upon the resolution of the previous three issues, however, the city was not entitled to judgment as a matter of law. See Civ.R. 56(C). The county's first assignment of error is sustained, except with respect to its rule-against-perpetuities argument, and the state's first and second assignments of error are sustained.

### Disgorge and Tender

{¶ 24} Because we have sustained the assignments of error attacking the trial court's order nullifying the 1997 transfer of the property, the trial court also erred in awarding specific performance to the city by ordering the county to relinquish the property and the state to tender an offer to the city to purchase the property. See *Fehrman v. Ellison* (1971), 32 Ohio App.2d 258, 261–262, 61 O.O.2d 286, 290 N.E.2d 190. The county's second and the state's third assignments of error are sustained.

### CONCLUSION

{¶ 25} Having sustained the assignments of error for the most part, we reverse the judgment of the trial court.

{¶ 26} In its September 2002 decision, the subject of these appeals, the trial court stated that it believed its 1999 dismissal of the complaint, on the grounds of the city's home-rule authority, "[wa]s still viable and appropriate." We remind the court below that its decision was reversed. "Absent extraordinary circumstances, such as an intervening decision by the Supreme Court, an inferior court has no discretion to disregard the mandate of a superior court in a prior appeal in the same case." *Nolan v. Nolan* (1984), 11 Ohio St.3d 1, 11 OBR 1, 462 N.E.2d 410, syllabus.

{¶ 27} Our mandate to the trial court also included instructions that "[w]here, as here, governmental entities have conflicting interests in a zoning matter, the trial court *must proceed* to the balancing test set forth in *Brownfield,* supra, which, in the context of this case, requires factual determinations that cannot be made on the face of what is otherwise a legally sufficient complaint." (Emphasis added.) *Hamilton Cty. Bd. of Commrs. v. Cincinnati,* supra. Upon remand, the

**512**

trial court shall comply with this court's 1999 mandate to proceed in accordance with *Brownfield*.

Judgment reversed
and cause remanded.

SUNDERMANN, P.J., GORMAN and PAINTER, JJ., concur.