**WAHAB JANITORIAL SERVICES, Appellant,**

v.

**P.M. GROUP MANAGEMENT, Appellee.**

[Cite as *Wahab Janitorial Services v. P.M. Group Mgt.*, 161 Ohio App.3d 632, 2005-Ohio-3037.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–040660.

Decided June 17, 2005.

Steven F. Stuhlbarg, for appellant.

Furnier & Thomas, Scott R. Thomas, and Jeanette N. Dannenfelser, for appellee.

MARK P. PAINTER, Judge.

{¶ 1} Plaintiff-appellant, Wahab Janitorial Services ("WJS"), appeals the grant of summary judgment in favor of defendant-appellee, P.M. Group Management ("PM"). WJS claims that PM contracted with WJS for maintenance services without disclosing its alleged agency relationship with principal Huntington Meadows Limited Partnership ("HMLP"). HMLP was the owner of Huntington Meadows—the apartment complex where the services were performed—and PM was the property manager.

{¶ 2} The trial court held (1) that the evidence was insufficient to support the claim that an enforceable contract existed between WJS and PM and (2) that if WJS could prove an agency relationship, PM was a disclosed agent for HMLP,

and therefore PM was not liable to WJS for the unpaid services. We reverse and remand.

## I. Things Were Going So Smoothly Until ...

{¶ 3} WJS is a sole proprietorship owned and operated by Wahab Ekunsumi. Formed in 1992, WJS offers a variety of maintenance services as an independent contractor.

{¶ 4} In 1999, WJS learned about the Huntington Meadows complex and decided to solicit the owners for business. WJS contends that after many attempts, a bid was submitted to PM and eventually accepted for WJS's services. WJS eventually became the sole provider of services at Huntington Meadows. Work was regularly assigned, and invoices submitted and paid. During this entire period, largely due to Ekunsumi's daily interactions with PM employees, WJS allegedly assumed that PM was the owner of Huntington Meadows.

{¶ 5} Beginning in March 2000, payments to WJS began falling behind. WJS contacted PM's office to arrange for payment of these invoices. In two letters, dated April 3, 2000, and August 9, 2000, PM employees gave assurances to WJS that payments for the past invoices would be forthcoming. The outstanding amounts referred to in the letters were eventually paid in full.

{¶ 6} WJS continued to work at Huntington Meadows from October 26, 2000, through May 15, 2001, without payment. Between September 2000 and December 2001, Ekunsumi began meeting with a PM executive about past-due invoices. WJS claims that it did not discover the true owner of Huntington Meadows, HMLP, until HMLP filed for bankruptcy. At that time, a PM executive informed WJS of HMLP's identity. WJS unsuccessfully sought payment for the unpaid work against HMLP in bankruptcy court. That was proper because if the principal is undisclosed, the principal is liable along with the agent.

{¶ 7} Soon thereafter, WJS brought suit against PM for payment of the past-due invoices plus interest. In its complaint, WJS claimed that PM had contracted for WJS's services and had breached the contract when it refused to pay for those services. PM moved for summary judgment based on what it contended was a lack of evidence establishing any contractual relationship between PM and WJS from October 26, 2000, through May 15, 2001, and a failure of WJS to meet the statute of frauds when seeking to have a party held liable for the debt of another. In response, WJS itself moved for summary judgment.

{¶ 8} WJS claimed that the evidence showed the existence of an ongoing contractual relationship with PM. WJS also argued that PM was liable for the contract it had formed with WJS as an agent for the undisclosed principal, HMLP. The trial court granted summary judgment for PM.

{¶ 9} On appeal, WJS assigns one error: that the trial court erred in granting PM's motion for summary judgment.

## II. We Had a Deal, So Pay Up

{¶ 10} Summary judgment is appropriate when (1) the moving party successfully establishes from the record the absence of a genuine issue of material fact on an essential element of the nonmoving party's case, (2) the nonmoving party would have the burden of proving that element at trial, and (3) the nonmoving party fails to produce sufficient evidence on the essential element in response to the motion.[1] If reasonable minds can reach but one conclusion in favor of the moving party, the moving party is entitled to a judgment as a matter of law.[2] In deciding whether to grant summary judgment, the trial court views any inferences drawn from the facts in the light most favorable to the nonmoving party.[3] On appeal, a challenge to a grant of summary judgment is reviewed de novo.[4]

{¶ 11} PM argues that there are no facts in the record to prove the existence of a contract between itself and WJS. That is not true. WJS offered evidence that PM employees provided ongoing work assignments to WJS. For an extended period, WJS was paid for completing the work assigned. These ongoing dealings never met with dissatisfaction or an attempt to terminate the relationship.

{¶ 12} In addition to this ongoing relationship of work done and paid for, Ekunsumi testified that a contract existed in the form of a bid for work that was accepted. "Civil Rule 56 does not provide for a trial court to undertake credibility determinations in resolving motions for summary judgment."[5] Therefore, Ekunsumi's testimony should be viewed the same as any other deponent's for summary-judgment purposes.

{¶ 13} The evidence of the uninterrupted, ongoing work relationship, combined with Ekunsumi's testimony, refutes PM's assertion that a contract did not exist. There is no question an agreement existed—the disputed issue is who the parties to the contract were. We conclude that whether a contract existed between WJS

---

1.  See Civ.R. 56(C) and (E); *Kulch v. Structural Fibers* (1997), 78 Ohio St.3d 134, 145, 677 N.E.2d 308.

2.  See *Celotex Corp. v. Catrett* (1986), 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265.

3.  See *Welco Industries, Inc. v. Applied Cos.* (1993), 67 Ohio St.3d 344, 346, 617 N.E.2d 1129.

4.  See *Hamilton Cty. Bd. of Commrs. v. Cincinnati*, 154 Ohio App.3d 504, 2003-Ohio-5089, 797 N.E.2d 1027, at ¶ 10.

5.  *Coney v. Youngstown Metro. Hous. Auth.*, 7th Dist. No. 00–CA–251, 2002-Ohio-4371, 2002 WL 1965321.

and PM is a disputed question that should be resolved by the factfinder at trial rather than upon a summary-judgment motion.

{¶ 14} In addition to the genuine issue of material fact as to whether a contract existed between WJS and PM, there is also a genuine issue concerning whether HMLP was an undisclosed principal of its agent, PM.

### III.  Principal? What Principal?

{¶ 15} WJS claims that PM is liable for the unpaid invoices as an agent for the true owner and undisclosed principal, HMLP. Where the agency relationship and the identity of the principal are unknown to the other party, the agent will generally be personally liable on a contract it enters into when acting within the scope of authority granted to it by the principal.[6] Therefore, when an agent contracts for the benefit of an undisclosed principal, both the principal and agent are jointly and severally liable for a breach of the agreement.[7] The agent is liable for any transactions that occur until after the identity of the principal and the relationship are disclosed.[8] If the party has notice that the agent is working for a principal but does not know the actual identity, the principal is deemed partially disclosed.[9] If the party has notice of the agency relationship and the identity of the principal, the principal is considered disclosed.[10]

{¶ 16} If it is found that PM—acting within its scope of authority—contracted for the benefit of HMLP, then the sole remaining issue to be resolved regarding PM's liability is whether HMLP was a disclosed, partially disclosed, or undisclosed principal. Similar to the issue whether a contract was formed, the facts surrounding this issue are not sufficiently determinative to grant summary judgment.

{¶ 17} WJS claims that both the agency relationship and the identity of HMLP as the principal remained undisclosed until HMLP initiated bankruptcy proceedings. WJS asserts that in all of its daily interactions with PM employees, the existence of HMLP was never brought to its attention. WJS contends that it

---

6.  See *James G. Smith & Assoc., Inc. v. Everett* (1981), 1 Ohio App.3d 118, 120, 1 OBR 424, 439 N.E.2d 932; *Dunn v. Westlake* (1991), 61 Ohio St.3d 102, 106, 573 N.E.2d 84; *Able/S.S., Inc. v. KM & E Servs., Inc.*, 11th Dist. No. 2000-L-162, 2002-Ohio-6470, 2002 WL 31663550, at ¶ 84.

7.  See *Illinois Controls, Inc. v. Langham* (1994), 70 Ohio St.3d 512, 524–25, 639 N.E.2d 771.

8.  See *DEF Industries, Inc. v. Wilcon Corp.* (Aug. 18, 1992), 2nd Dist. No. 13233, 1992 WL 206773.

9.  See *James G. Smith & Assoc., Inc.*, supra;  Restatement of the Law 2d, Agency (1958), Section 4.

10.  Id.

associated the name "Huntington Meadows" only with the actual apartment complex and as a "doing business as" name for PM, but never with a separate entity.

{¶ 18} In opposition, PM cites numerous references to Huntington Meadows in its interactions with WJS. PM points out that every check that WJS received showed the drawer to be "Huntington Meadows" and that WJS addressed its invoices to "Huntington Meadows." PM disputes that WJS could have understood the references to Huntington Meadows as a d/b/a for PM. Rather, PM argues that these references to Huntington Meadows, together with Ekunsumi's business experience and education, gave notice to WJS of the existence of the principal, HMLP, and the agency relationship.

{¶ 19} WJS responds that while there were many references to "Huntington Meadows," there was nothing that ever referred specifically to HMLP. No corporate or limited-partnership status was reflected on any of the documents. PM employees gave WJS all of its work assignments and then inspected the work after completion. And PM employees even signed all the checks from Huntington Meadows.

{¶ 20} In addition, the letters dealing with past-due invoices were on PM letterhead and signed by PM employees. In these letters, as well as on the checks, there was no mention of a limited-partnership business structure; instead, the only reference was to Huntington Meadows.

{¶ 21} We conclude that WJS offered sufficient evidence to create a genuine issue of material fact as to whether HMLP was an undisclosed principal. The disputed status of the principal must be determined only after considering all the factual evidence at a trial.

{¶ 22} There is no question that a contract existed between WJS and some entity—the only issue is whether the contract was directly with PM or whether there was sufficient disclosure of the agency relationship and the identity of the principal to allow PM to avoid liability. The answer is the same if the contract was with PM itself or if PM was an agent for an undisclosed or partially disclosed principal, HMLP. PM would be liable in either instance. These are genuine issues of material fact. Therefore, summary judgment was inappropriate.

{¶ 23} Accordingly, we sustain WJS's sole assignment of error, reverse the trial court's judgment, and remand this cause to the trial court for further proceedings consistent with this opinion.

{¶ 24} As an additional matter, PM moved for sanctions against WJS under App.R. 23, arguing that there was no reasonable basis in law or fact for this

appeal.  Obviously, because of our ruling reversing the trial court, this appeal was far less than frivolous, and PM's motion is denied.

Judgment reversed
and cause remanded.

DOAN, P.J., and HILDEBRANDT, J., concur.